# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
### MARTINSBURG

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

  **v.**                              **Criminal Action No. 3:14-cr-28**

**SHAQUILLE MONTEL ROBINSON,**

      **Defendant.**


## REPORT AND RECOMMENDATION THAT DEFENDANT'S MOTION TO SUPPRESS [21] BE GRANTED

## I.  INTRODUCTION

This matter comes before the Court on Defendant Shaquille Montel Robinson's Motion to Suppress [21], filed on July 11, 2014. On July 22, 2014, the United States of America (hereinafter, "the Government") filed its Opposition to Defendant's Motion to Suppress [25]. On July 28, 2014, Defendant filed his Reply to the United States' Response in Opposition to Motion to Suppress [26]. On July 31, 2014, the Court held an evidentiary hearing and argument on Defendant's Motion to Suppress. Defendant appeared in person and by counsel, Nicholas J. Compton, Assistant Federal Public Defender. The Government appeared by Jarod J. Douglas, Assistant United States Attorney. At the hearing, the Government presented the testimony of Trooper D.R. Walker with the West Virginia State Police and three officers from the Ranson Police Department: Officer Crystal Tharpe, Officer Kendall Hudson and Captain Robbie Roberts. No additional testimony or other evidence was presented.

## II. PROCEDURAL HISTORY

Defendant was indicted by a Grand Jury sitting in the Northern District of West Virginia on May 29, 2014. (ECF No. 1). Defendant is charged with being a felon in possession of a firearm and ammunition, in violation of Title 18, United States Code, Section 922(g)(1) and 924(a)(2). (*Id.*).

## III. STATEMENT OF THE FACTS

On March 24, 2014, a call from an unknown male came into the Ranson Police Department at approximately 3:55 p.m. (Tr. 16). After hearing the tip, the Ranson Police Department secretary decided to transfer the call to Officer Chrystal Tharp. (*Id.*). Officer Tharp was advised by the caller that he had witnessed "a black male in a bluish greenish Toyota Camry load a firearm, conceal it in his pocket and there was a white female driver." (*Id.*). The caller stated that the car was in the parking lot of a 7-Eleven, which Officer Tharp understood to be the 7-Eleven on North Mildred Street located next to the Apple Tree Garden apartments. (*Id.*). The 7-Eleven is located approximately fifty (50) yards from the Apple Tree Garden apartments, which is accessible by walking over a grassy area. (Tr. 6, 28). The officers classified the City of Ranson, and particularly the Apple Tree Garden apartments, as a high crime area. (Tr. 4-7, 19-21, 43-44, 54, 56-58).

The caller stated the car left the parking lot and headed south on North Mildred Street. (Tr. 17). Officer Tharp relayed this information to Officer Kendall Hudson and Captain Robbie Roberts, who were present in the room during the call. (*Id.*). Officer Hudson left the station before Officer Tharp completed the phone call so he "could get out on the road and look for the vehicle and the person she was explaining." (Tr. 35). Captain Roberts then left to provide back

up for Officer Hudson. (R. 58-59). The caller never identified himself or provided contact information. (R. 24-25).

After leaving the police station, Officer Hudson made a left onto North Mildred Street. (Tr. 37). Officer Hudson noticed the vehicle that the matched the description along with the two occupants behind him. (*Id.*). After seeing the car, he turned into Jay's Automotive to let the car go by him. (*Id.*). As the car passed by him, he noticed the two occupants were not wearing their seatbelts. (*Id.*). Officer Hudson immediately pulled behind the vehicle, turned on his lights and the vehicle pulled over across from the Southern States parking lot, approximately seven blocks, or three-quarters of a mile, south of the 7-Eleven. (Tr. 38, 48). Upon pulling the car over, Officer Hudson dispatched the traffic stop and provided the location of the vehicle. (Tr. 38). Captain Roberts had already left the police station when Officer Hudson called in the traffic stop so he proceeded to the location. (Tr. 59). Officer Hudson stated that the stop occurred approximately two to three minutes after the anonymous call came into the police station. (Tr. 39).

Officer Hudson approached the vehicle from the driver's side with his weapon drawn, which he carried "down" and "low," below his waist. (Tr. 39). Officer Hudson asked the female driver for her license, registration and insurance. (*Id.*). Officer Hudson also asked the passenger for his identification but then realized "this guy might have a gun. I'm asking him to get into his pocket to get his I.D. That's probably not a good idea." (*Id.*). Officer Hudson then asked the passenger to exit the vehicle. (R. 41). At this point Captain Roberts had arrived on scene. (Tr. 41, 60).

Captain Roberts approached the rear of the vehicle and asked Officer Hudson if he had checked the passengers and he said "no." (Tr. 41, 60). Captain Roberts then approached the passenger side of the vehicle and opened the passenger side door. (Tr. 61). Captain Roberts

asked Defendant if he had any firearms on his person as Defendant was exiting the vehicle. (*Id.*). Defendant then gave a "weird look" or an "oh crap look," which the officer took to mean "I don't want to lie to you, but I'm not going to tell you anything."[1] (Tr. 62). At this time, Captain Roberts had Defendant put his hands on top of the car and he began to pat him. (*Id.*). Captain Roberts felt the handle of a firearm at Defendant's waist at his front pants pocket. (Tr. 63).

Captain Roberts told Officer Hudson "gun," indicating that he had found the gun on Defendant. (Tr. 42). Officer Hudson then placed handcuffs on Defendant and sat him on the sidewalk. (Tr. 42, 64). Officers asked the female driver, who was acting "hysterical" and crying, to get out of the vehicle and questioned her regarding "why someone would call with this information." (Tr. 42). The female driver received a verbal warning for the seatbelt violation and was allowed to leave the scene. (Tr. 43).

Following the frisk and after Defendant was handcuffed, Captain Roberts recognized Defendant as Mr. Robinson and connected him to being a convicted felon. (Tr. 64-65).

## IV. CONTENTION OF THE PARTIES

Defendant argues that the police lacked an adequate basis to perform a traffic stop, based on the information provided by the anonymous caller, which failed to allege criminal activity. Defendant states that West Virginia allows individuals to openly carry firearms and issues concealed carry permits, and therefore, carrying a loaded firearm does not create reasonable suspicion of a crime. Moreover, Defendant asserts that there was no indication that the caller knew Defendant was a felon or a person who could not possess a weapon. Second, Defendant

---

[1] The exact timing of this series of events is unclear based on Captain Roberts's testimony. First, Captain Roberts testified that he opened the door and asked Defendant if he had any weapons on him and he gave the weird look, then he asked him to step out of the car. (Tr. 61). Then he testified that "when I opened [the car door], he was stepping out." (*Id.*). When asked to clarify when he asked Defendant if he has a firearm, Captain Roberts stated "I think I asked him before he even got out of the car. I think as he was getting out of the car, I asked him if he had any weapons on him." (*Id.*). When the Government's counsel clarified "[a]s he is getting out, you asked him if he had any weapons on him" and Captain Roberts said "Yes." (Tr. 62).

argues that the officers lacked an adequate basis to conduct a search of his person because Defendant gave officers no indication that he was armed or dangerous. Defendant further argues that after stopping the vehicle, the officers acted so quickly in asking Defendant to step out of the vehicle and in performing the frisk, that the officers had no time to assess Defendant's conduct, had not checked his criminal history and had no time to develop reasonable suspicion for suspecting Defendant to be armed and dangerous. In addition, Defendant argues that the anonymous tip lacked sufficient indicia of reliability based on the caller's anonymity and the brief nature of the call.

The Government argues that observing a traffic violation provided sufficient justification for Officer Hudson to detain the vehicle. Here, Officer Hudson observed the driver and passenger of the vehicle not wearing their seat belts, a violation of West Virginia law. Thus, Officer Hudson had sufficient justification for conducting the traffic stop. Second, the Government argues that the anonymous tip was reliable based on the caller's eyewitness knowledge and the contemporaneity between the observation and the report. Third, the Government contends that the police harbored reasonable suspicion that Defendant was armed and dangerous because: 1) the officers possessed knowledge from a reliable call that approximately seven minutes earlier Defendant was seen loading a handgun and concealing it in his pocket; 2) when asked if he was in possession of a firearm, Defendant did not deny the allegation and gave a "weird look;" and 3) the case involved a location that officers believed to be a high crime area.

## V. ANALYSIS

### A. Lawfulness of the Traffic Stop

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const.

amend. IV. "Temporary detention of individuals during the stop of an automobile by the police…constitutes a 'seizure'" within the meaning of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809 (1996); s*ee also Delaware v. Prouse*, 440 U.S. 648, 653 (1979). "Because a traffic stop is more analogous to an investigative detention than a custodial arrest, we treat a traffic stop, whether based on probable cause or reasonable suspicion, under the standard set forth in *Terry*." *United States v. Digiovanni*, 650 F.3d 498, 506 (4th Cir. 2011).

Under the *Terry* standard, the court analyzes "the propriety of a traffic stop on two fronts. First, we analyze whether the police officer's action was justified at its inception. Second, we analyze whether the police officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop." *Digiovanni*, 650 F.3d at 506 (citing *United States v. Rusher*, 966 F.2d 868, 875 (4th Cir.1992)). A traffic violation "provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop." *United States v. Branch,* 537 F.3d 328, 335 (4th Cir. 2008).

As part of a routine traffic stop, "the officer may request a driver's license and vehicle registration, run a computer check, and issue a citation, but that '[a]ny further detention for questioning is beyond the scope of the *Terry* stop and therefore illegal unless the officer has a reasonable suspicion of a serious crime.'" *United States v. Brugal*, 209 F.3d 353, 358 (4th Cir. 2000) (citing *Rusher*, 966 F.2d at 876–77); *see also Digiovanni*, 650 F.3d at 507 (explaining that "[i]f a police officer seeks to prolong a traffic stop to allow for investigation into a matter outside the scope of the initial stop, he must possess reasonable suspicion or receive the driver's consent." Also during a routine traffic stop an officer may request the driver exit the vehicle. *See Pennsylvania v. Mimms*, 434 U.S. 106, 111, n. 6 (1977) (finding that "once a motor vehicle has been lawfully detained for a traffic violation, the police may order the driver to get out of the

vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures."). In addition, "an officer making a traffic stop may order passengers to get out of the car pending completion of the stop." *Maryland v. Wilson*, 519 U.S. 408, 415 (1997).

"As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren*, 517 U.S. at 810. Any ulterior motive a police officer may have for making the traffic stop is irrelevant. *See Id.* at 813; *see also Ohio v. Robinette*, 519 U.S. 33, 38 (1996) (finding that "in light of the admitted probable cause to stop Robinette for speeding, Deputy Newsome was objectively justified in asking Robinette to get out of the car, subjective thoughts notwithstanding.").

In the present case, Officer Hudson testified that he stopped the vehicle on the basis of the seat belt violation. (Tr. 38). Pursuant to W.Va. Code § 17C-15-49(a), "[a] person may not operate a passenger vehicle on a public street or highway of this state unless the person…is restrained by a safety belt meeting applicable federal motor vehicle safety standards." Even though Officer Hudson gave another reason for the stop on cross examination, by affirming that he was "stopping them because they matched the description of the vehicle where the guy had the firearm," Officer Hudson did state that a traffic violation occurred. (Tr. 49). Despite any pretext the seat belt violation may have served in justifying the traffic stop, the evidence indicates that Officer Hudson observed a seat belt violation prior to pulling over the vehicle. (Tr. 37). Moreover, the parties do not appear to contest the fact that the driver was not wearing her seat belt at the time of the traffic stop. Accordingly, the Court finds that Officer Hudson had probable cause to believe a seat belt violation occurred, which justified the traffic stop.

### B. Protective Search, or *Terry* Frisk, after the Traffic Stop

#### 1. *Terry* Frisk Permissible When Reasonable Articulable Suspicion Exists that a Suspect is Armed and Dangerous

After a valid traffic stop has been made, the first *Terry* condition (i.e., a stop) has been established and the police may detain an automobile for the purposes of inquiring into the traffic violation, as such the "police need not have, in addition, cause to believe any occupant of the vehicle is involved in criminal activity." *Arizona v. Johnson*, 555 U.S. 323, 327 (2009). "If a police officer seeks to prolong a traffic stop to allow for investigation into a matter outside the scope of the initial stop, he must possess reasonable suspicion or receive the driver's consent." *Digiovanni*, 650 F.3d at 507. Similarly, if after conducting the traffic stop the police develop a reasonable articulable suspicion that a person in the vehicle is armed and presently dangerous then the police may conduct a *Terry* frisk. *See Arizona v. Johnson*, 555 U.S. at 327 (explaining that "[t]o justify a patdown of the driver or a passenger during a traffic stop… just as in the case of a pedestrian reasonably suspected of criminal activity, the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Id.* "[I]f the officer has a reasonable fear for his own and others' safety based on an articulable suspicion that the suspect may be armed and presently dangerous, the officer may conduct a protective search of, *i.e.,* frisk, the outer layers of the suspect's clothing for weapons." *United States v. Holmes*, 376 F.3d 270, 275 (4th Cir. 2004) (citing *Terry*, 392 U.S. at 30-31) (internal quotation marks omitted).

However, the Fourth Circuit has held that a mere "generalized risk" to officer safety is not sufficient to justify a *Terry* frisk:

> *Terry* and *Long* require a specific, articulable suspicion of danger before police officers are entitled to conduct a 'pat-down.' Thus, where the intrusion is greater than an order to exit the car, the Court requires commensurately greater justification…[w]e conclude that we may not rely on a generalized risk to officer safety to justify a routine 'pat-down' of all passengers as a matter of course. Because a frisk or 'pat down' is substantially more intrusive than an order to exit a vehicle or to open its doors, we conclude that an officer must have justification for a frisk or a 'pat-down' beyond the mere justification for the traffic stop.

*United States v. Sakyi*, 160 F.3d 164, 168-69 (4th Cir. 1998) (citing *Holmes*, 376 F.3d at 276).

"[I]n the absence of reasonable suspicion, an officer may not frisk a citizen merely because he feels uneasy about his safety." *United States v. Burton*, 228 F.3d 524, 529 (4th Cir. 2000). The officer must possess "a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant the officer in believing that [a] suspect is dangerous and…may gain immediate control of weapons within the vehicle." *Holmes*, 376 F.3d at 276l.

### 2. Reasonable Suspicion Standard under *Terry*

"The Government bears the burden of articulating facts sufficient to establish reasonable suspicion." *Burton*, 228 F.3d at 528. The reasonable suspicion standard "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Wardlow v. Illinois,* 528 U.S. 119, 123 (2000). However, the *Terry* reasonable suspicion standard does require "a minimal level of objective justification" for the police action. *Id.* at 676. The Government "must be able to articulate something more than an inchoate and unparticularized suspicion or hunch." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry,* 392 U.S. at 27). As the Fourth Circuit explained:

> [T]he Government must do more than simply label a behavior as "suspicious" to make it so. The Government must also be able to articulate why a particular behavior is suspicious or logically demonstrate, given the surrounding circumstances, that the behavior is likely to be indicative of some more sinister activity than may appear at first glance.

*United States v. Foster*, 634 F.3d 243, 248 (4th Cir. 2011). The Fourth Circuit has found that the *Terry* reasonable suspicion standard is "a commonsensical proposition," and that "[c]ourts are not remiss in crediting the practical experience of officers who observe on a daily basis what transpires on the street." *United States v. Lender,* 985 F.2d 151, 154 (4th Cir.1993). Moreover, "[t]he reasonable suspicion standard is an objective one, and the officer's subjective state of

mind is not considered." *United States v. George,* 732 F.3d 296, 299 (4th Cir. 2013) *cert. denied*, 134 S.Ct. 1530 (U.S. 2014).

In addition, the specific facts justifying the search must be known to the officers before the protective search, or frisk, was conducted. "The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search." *Florida v. J.L.*, 529 U.S. 266, 271 (2000). "That the allegation about the gun turned out to be correct does not suggest that the officers prior to the frisks, had a reasonable basis for suspecting [the defendant] of engaging in unlawful conduct." *Id.* "A reasonable belief that a person is armed and presently dangerous must form the predicate to a patdown of the person for weapons." *Ybarra v. Illinois*, 444 U.S. 85, 86 (1979).

Moreover, "reasonable suspicion is a particularized and objective basis for suspecting that the person to be frisked is armed and dangerous." *United States v. Powell*, 666 F.3d 180, 185-86 (4th Cir. 2011) (citing *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). In fact, "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27.  As such, "[i]n determining whether such reasonable suspicion exists, we examine the 'totality of the circumstances' to determine if the officer had a 'particularized and objective basis' for believing that the detained suspect might be armed and dangerous." *George*, 732 F.3d at 299 (citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

3. **Examining the Totality of the Circumstances in Determining Whether an Officer had a "Particularized and Objective Basis" to Suspect that an Individual May be Armed and Dangerous**

Various cases from the Fourth Circuit provide guidance on the consideration of factors in support of reasonable suspicion that an individual is armed and presently dangerous.

In *George*, the police stopped a vehicle in a high-crime area at 3:30 a.m. after witnessing the vehicle chasing another vehicle and running a red light. *See George*, 732 F.3d at 297. After pulling over the vehicle for the traffic violation and observing suspicious conduct, the police officer asked the defendant to exit the vehicle and frisked him, discovering a firearm. *Id.* The district court denied the defendant's motion to suppress and he appealed. *Id.* at 299. In examining the totality of the circumstances, the Fourth Circuit found that the frisk of the defendant was "supported by objective and particularized facts sufficient to give rise to a reasonable suspicion that George was armed and dangerous." *Id.* at 300. The factors the Court pointed to include: 1) the stop occurred late at night (i.e., 3:30 a.m.) in a high crime area; 2) the circumstances of the stop suggested the occupants of the car "might well be dangerous" because the police officer observed the vehicle aggressively chasing a vehicle in front of it, which "indicated a hostility between the two vehicles" and then the vehicle slowed down and ended its pursuit once the officer began following the vehicle; 3) the vehicle was occupied by four males, increasing the risk; 4) George acted nervously when the officer approached the vehicle, he failed to put his hands on the headrest when ordered to do so and he did not make eye conduct with the officer; 5) the driver of the vehicle made misleading statements and gave an implausible explanation for his aggressive driving; 6) George's movements indicated he may have been carrying a weapon because his right hand was on the seat next to his right leg and was concealed by his thigh and when ordered to put his hands on the headrest, George moved his left hand, but not his right; and

11

7) after the officer ordered George to exit the vehicle, he dropped his wallet and cell phone as he got out of the car and then bent over to pick them up, which the officer perceived as creating an opportunity to reach for a weapon or escape. *Id.* at 300-01. The Fourth Circuit found that these factors in their totality provided the "particularized and objective basis" for believing George to be armed and dangerous. *Id.* at 301.

In *Powell*, the police conducted a routine traffic stop for a burned-out headline. *United States v. Powell*, 666 F.3d 180, 182 (4th Cir. 2011). Two officers approached the car, one asked for the driver's license and registration, the other approached the passenger side of the car and made amicable conversation with the passenger, Powell. *Id.* at 183. The driver's licence was suspended and after checking Powell's license, the officers learned that Powell had "priors" for armed robbery, which the officer's referred to as "caution data." *Id.* at 184. Neither Powell nor the other occupants of the car "appeared suspicious or presented any threat or problem to the officers." *Id.* However, based on the "caution data," the officers ordered Powell out of the vehicle and performed a patdown. *Id.* During the patdown Powell became nervous and attempted to unsuccessfully flee from the officers. *Id.* The officers then removed a backpack from the vehicle near where Powell had been sitting and discovered a handgun in the backpack. *Id.* Defendant appealed the denial of his motion to suppress arguing that the police lacked reasonable suspicion that he was armed and dangerous. *Id.* at 185. The Government contended that "[o]fficers cannot be expected to blind themselves to obvious risks of danger when a person they encounter demonstrates a willingness to be untruthful, especially when there is information that the person has been involved previously in violence." *Id.* The Fourth Circuit first examined the overall context of the traffic strop and found that the interaction with Powell began as a routine traffic stop, there was no evidence the stop occurred in a high crime area, the four

officers outnumbered the three occupants of the car, the occupants were amicable and cooperative with the officers, the occupants did not engage in threatening or evasive conduct, they did not "display any of the tell-tale signs typically associated with illegal and dangerous activity (*e.g.*, evidence of drug-dealing, gang affiliation, or possible concealed weapon)," and Powell was told he was free to leave, which indicates the police did not considered him to be armed and dangerous. *Id.* at 187. The Court found that "this context clearly provides no basis for the officers to reasonable suspect that Powell might have been armed and dangerous." *Id.* The Court then looked to the totality of the circumstances that were present as the patdown began, which included the caution data that the Powell had a prior criminal history of violent crimes and Powell's deliberate misrepresentation regarding his driver's license. *Id.* The Fourth Circuit found that the caution data, without more, does not justify a reasonable suspicion that Powell was armed and dangerous. *Id.* at 188. Similarly, the Court found that making false statements, without more, are insufficient to establish reasonable suspicion. *Id.* at 188-89. The Fourth Circuit concluded that "a reasonably prudent officer in these circumstances would not be warranted in suspicion that Powell was armed and dangerous on the night of the traffic stop. Accordingly, the patdown was not permissible under the Fourth Amendment." *Id.* at 189.

In *Neely*, the defendant was stopped for a headlights violation. *See United States v. Neely*, 564 F.3d 346, 348 (4th Cir. 2009). The driver provided the officer with his license and registration and gave consent to search the trunk of the vehicle. *Id.* However, when the defendant fumbled to find the button to unlock his trunk for about thirty seconds, the officer conducted a protective search of the vehicle. *Id.* The "protective search" of the interior of the vehicle revealed a firearm in the passenger area of the car. *Id.* at 348-49. The district court found that the officer had "articulable suspicion" to perform the vehicle search because the defendant was in a high

crime area at 3:00 a.m. and "because of [the defendant] fumbling." *Id.* at 352. On appeal, Neely

argued that the search was not a valid protective search because the officer did not possess a

reasonable belief based on specific and articulable facts that he was armed and dangerous. *Id.* at

348-49. The Fourth Circuit reversed and held that "[f]umbling in a dark car in the middle of the

night under the watchful eyes of two law enforcement officers for a trunk button does not,

without more, create a reasonable suspicion that Neely was *dangerous*" even though the stop

occurred in a high crime area late at night. *Id.*

The *Neely* court distinguished their facts from the *Holmes* case in which the court found

the protective search to be warranted. *See United States v. Holmes,* 376 F.3d 270, 277 (4th Cir.

2004). In *Holmes*, the defendant was suspected to be a "member of a gang whose members had

carried out numerous violent felonies while armed." *Id.* There, the Court found that the prior

knowledge of the suspect's criminal history and knowledge of his involvement with a gang

known to commit violent crimes involving weapons supported the officer's reasonable suspicion

that the suspect was armed and dangerous. *Id.* at 278. Similarly, in *Elston*, the officers

"possessed detailed information about the defendant due to a 911 call that identified the

defendant as threatening to shoot someone in the near future." *United States v. Elston*, 479 F.3d

314, 318-19 (4th Cir.), *cert denied*, 550 U.S. 927 (2007). By contrast, in *Neely*, the officer "had

no information that would lead him to believe that Neely either had committed violent crimes in

his past or posed an immediate threat to the public." *Neely*, 564 F.3d at 352. The Court reasoned:

> Neely, unlike the defendants in *Holmes* and *Elston*, was not thought to be a member of a violent gang with
> an outstanding arrest warrant or an imminent violent threat based on a detailed 911 tip. There was no
> evidence or suggestion that Neely was armed. Moreover, Neely never hesitated or complained about
> following Tran's orders, never became belligerent, never threatened, intimidated, or in any way suggested
> that he intended harm. He was not overly nervous or evasive. These factors, combined with Officer Tran's
> testimony that Neely was free to leave at any time, render us unable to say that Neely's actions or past
> behavior allowed Officer Tran to reasonably believe Neely was dangerous. The simple discovery of a
> weapon cannot, of course, create reasonable suspicion after the fact. As such, we are unable to find that
> Tran's search of Neely's vehicle was justified under Holmes.

*Id.* at 352-53.

These cases demonstrate the need for specific articulable facts that demonstrate the police officer had a "particularized and objective basis" for believing an individual is armed and presently dangerous. Moreover, the Fourth Circuit has noted their "concern about the inclination of the Government toward using whatever facts are present, no matter how innocent, as indicia of suspicious activity." *Foster*, 634 F.3d at 248.

### 4. Totality of the Circumstances Surrounding the *Terry* Frisk of Defendant

Similar to the Fourth Circuit's analyses outlined above, the undersigned reviewed the overall context of the traffic stop to determine whether the totality of the circumstances demonstrate a "particularized and objective basis" for officers to suspect that Defendant was armed and dangerous as required to justify the *Terry* frisk for weapons.

*First*, the anonymous tip provided officers with information that a black male passenger in a bluish Toyota Camry in the parking lot of 7-Eleven near Apple Tree Gardens was seen loading a firearm and concealing the firearm in his pocket. (Tr. 16). The caller further stated that the car was driven by a white female and that the car left the parking lot going south on North Mildred Street. (*Id.*).

*Second*, Trooper Walker,[2] Officer Tharp,[3] Officer Hudson[4] and Captain Roberts[5] each testified that the city of Ranson and specifically Apple Tree Garden apartments are considered to

---

[2] Trooper D.R. Walker, who has worked with the West Virginia State Police for approximately a year and a half, testified that he has been called to Ranson "more times than I can count." (Tr. 4). He stated he was specifically called to the Apple Tree Garden apartments "quite a few times." (Tr. 5). His experience at the apartment complex has been "mostly drug activity and high crime rate, fights, things like that." (Tr. 5). He explained a recent drug seizure at the complex involved three search warrants that resulted in the confiscation of forty-nine (49) grams of crack and about three and a half grams of heroin, along with other small quantities. (Tr. 5). In regard to the connection of the 7-Eleven to the Apple Tree Garden apartments, the Trooper explained that "usually if someone is afraid to walk into Apple Tree to purchase narcotics, they will go to 7-Eleven" and a person will come from the apartment complex to the parking lot for the drug transaction. (Tr. 6). Trooper Walker testified his experience of this taking place occurred "quite a few times," which he quantified as more than twenty (20) but less than thirty (30).

be high crime areas based on the officers' knowledge and experience. Officers further testified that crime from Apple Tree Gardens often "spilled over" into the 7-Eleven parking lot as evidenced by shoplifting, thefts and drug trafficking activities in the parking lot. The traffic stop was conducted seven blocks south of this area. When considering the location of a stop or frisk in a "high crime area," the Fourth Circuit has held that "although standing alone this factor may not be the basis for reasonable suspicion to stop anyone in the area, it is a factor that may be considered along with others to determine whether police have a reasonable suspicion based on the totality of the circumstances." *United States v. Mayo*, 361 F.3d 802, 807 (4th Cir. 2004).

*Third*, as Defendant was exiting the car, Captain Roberts testified that when he asked whether Defendant was in possession of a firearm, Defendant gave a "weird look" or an "oh crap

---

(Tr. 6-7). The Trooper stated he had not personally been associated with the seizure of any firearms in that area but he is aware of calls to the apartment complex for reports of firearms. (Tr. 7).

3 Officer Tharp has served with the Ranson Police Department for about eight (8) years. (Tr. 19). She testified she had "a lot" of experience with crime at the Apple Tree Gardens, including a murder case in 2012, numerous drug cases, assisting in search warrants for drug cases and simple offenses such as loitering and drinking. (*Id.*). She classified Apple Tree Gardens as "the number one crime place" in Ranson. (*Id.*). Officer Tharp further affirmed that she had experience with crime "spilling over" into the 7-Eleven and explained "[w]hen I was doing drug work and I dropped an informant off to buy drugs there, there were three other people waiting for drugs in that parking lot." (Tr. 20). Officer Tharp also stated that she received "numerous complaints from the management [of the 7-Eleven] saying that people are running – basically they will park in a car and someone will run from Apple Tree to the car, make a transaction, and run back." (*Id.*). She testified that she also had experience with firearms in the area a "few times." (*Id.*). She described one incident when she approached Apple Tree Gardens due to a complaint that an individual was dealing drugs and when she arrived, he ran from her and threw a weapon. (Tr. 20-21). There were the two instances that came to her mind quickly. (Tr. 21).

4 Officer Hudson has served with the Ranson Police Department since December 2012. (Tr. 35). Officer Hudson testified that "Apple Tree Gardens is one of our highest crime rates that we have." (Tr. 43). He stated that he experienced "spillover crime" at the 7-Eleven with "riffraff coming from Apple Tree walking back and forth." (*Id.*). He stated that there were multiple shopliftings at the 7-Eleven. (Tr. 44). He personally had not been involved in gun seizures in that area. (*Id.*). Officer Hudson indicated a heightened level of alert for calls involving Apple Tree Gardens stating that "anytime you hear Apple Tree or 7-Eleven, your radar goes up a notch." (Tr. 54). He continued to explain "we get gun calls every now and then, sir. And then when you hear something from Apple Tree…you put yourself in that situation where you think it's definitely going to happen. It could be there." (*Id.*).

5 Captain Roberts testified that he has worked in law enforcement in Jefferson County for twenty-eight (28) years. (Tr. 56). He currently works as the Captain of the Ranson City Police Department. (*Id.*). Captain Roberts stated that in Ranson, the Apple Tree complex has the most crime. (Tr. 57). Captain Roberts testified as to the "spillover of crime" from the Apple Tree Gardens to the 7-Eleven with problems such as "theft, drug deals, gunshots, you name it." (*Id.*). Captain Roberts affirmed that the drug dealing problem from Apple Tree Garden would spill over into the 7-Eleven parking lot because "[i]t is in walking distance, so, you know, sometimes people take it away from their residence." (Tr. 58).

look," which the officer took to mean "I don't want to lie to you, but I'm not going to tell you anything." (Tr. 62).

The following factors tend to weigh against the Government's argument that reasonable suspicion justified the *Terry* frisk:

*First*, the information provided by the anonymous caller did not indicate Defendant was engaged in criminal activity, such as drug dealing, or engaged in threatening behavior, such as brandishing the weapon. (Tr. 24-27).

*Second*, upon stopping the vehicle, the driver complied with Officer Hudson's request and provided her license and registration. (Tr. 39). Defendant also attempted to comply with Officer Hudson's request to provide identification until he was stopped and ordered out of the vehicle. (*Id.*). Officer Hudson testified that Defendant was cooperative. (Tr. 53).

*Third*, at the time Officer Hudson ordered Defendant out of the car and Captain Roberts began the protective search, Defendant had not made any furtive gestures, movements or inconsistent statements to indicate that he was nervous, armed or intending to reach for a weapon. (Tr. 53).

*Fourth*, the stop occurred during daylight, at approximately 4:00 p.m., and only two occupants were in the vehicle, one female and one male. (Tr. 16, 40).

The strongest factor in support of the Government's argument that Defendant was armed and dangerous is the anonymous tip, which reported that a black male loaded and the concealed a firearm, in the parking lot of the 7-Eleven, which is in a high crime area of Ranson. Anonymous tips, alone, are not sufficient to demonstrate reasonable suspicion to conduct a *Terry* stop and frisk. *J.L.*, 529 U.S. at 272, 120 S. Ct. 1375 (finding that "[u]nlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to

be fabricated, 'an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity.'" *Id.* (citing *Alabama v. White,* 496 U.S. 325, 327 (1990); *Adams v. Williams*, 407 U.S. 143, 146-47 (1972)). However, there are situations where an anonymous tip, when suitably corroborated, may provide "sufficient indicia of reliability" to support reasonable suspicion. *Alabama v. White,* 496 U.S. at 327; *see also Elston*, 479 F.3d at 318. Therefore, only after an anonymous tip exhibits indicia of reliability may the subsequently corroborated information justify the investigatory stop or protective search under *Terry.*

The Supreme Court in *Gates* adopted a "'totality of the circumstances' approach to determining whether an informant's tip establishes probable cause." *Alabama v. White*, 496 U.S. at 328 (citing *Illinois v. Gates*, 462 U.S. 213 (1983)). "*Gates* made clear, however, that those factors that had been considered critical under *Aguilar* and *Spinelli* - an informant's 'veracity,' 'reliability,' and 'basis of knowledge' - remain 'highly relevant in determining the value of his report.'" *Id*. While *Gates* dealt with probable cause, the Court in *Alabama v. White* found "these factors are also relevant in the reasonable-suspicion context, although allowance must be made in applying them for the lesser showing required to meet that standard." 496 U.S. at 328-29. When "an informant's tip supplies part of the basis for reasonable suspicion, [the court] must ensure that the tip possesses sufficient indicia of reliability." *United States v. Perkins*, 363 F.3d 317, 323 (4th Cir. 2004).

The recent Supreme Court case of *Navarette v. California* addressed the reliability of an anonymous tip in supporting reasonable suspicion to conduct a *Terry* stop. 134 S. Ct. 1683, 1688 (U.S. Apr. 22, 2014). *Navarette* involved an investigative vehicle stop based on an anonymous tip by a 911 caller who reported that a "vehicle had run her off the road." *Id.* at 1686. The caller provided the location of the vehicle as well as the direction it was headed and described the

vehicle, including the color, make, model and license plate number. *Id.* Police officers located the vehicle and executed a traffic stop based on the tip. *Id.* The Supreme Court held that the stop complied with the Fourth Amendment because "the officer had reasonable suspicion that the driver was intoxicated" based on the anonymous tip. *Id.* In finding that the police had reasonable suspicion to conduct an investigative stop, the Court considered various factors demonstrating the tip bore adequate indicia of reliability. *Id.* at 1688. The Supreme Court found first, that eyewitness knowledge "lends significant support to the tip's reliability." *Id.* at 1689. Second, the 911 caller made a "contemporaneous report" which has "long been treated as especially reliable." *Id.* Specifically, "[p]olice confirmed the truck's location near mile marker 69 (roughly 19 highway miles south of the location reported in the 911 call) at 4:00 p.m. (roughly 18 minutes after the 911 call)." *Id.* Third, the Court credited the caller's use of the 911 emergency system, which allows for "identifying and tracing callers, and thus provide some safeguards against making false reports with immunity." *Id.*

In the present case, the caller made a claim of eyewitness knowledge – he stated he personally observed a black male passenger in a bluish Toyota Camry loading a firearm and concealing the firearm in his pocket. This eyewitness knowledge supports the veracity of the tip. Second, the contemporaneity between the observation and the report was substantial (*i.e.,* the vehicle was located within two or three minutes of the call and only about seven blocks from the location of the reported observation at the 7-Eleven). This contemporaneity between the tip and Officer Hudson's location of the vehicle also supports the reliability of the tip. Third, the caller did not report the tip through the 911 emergency system, which detracts from the reliability of the tip.

However, a reliable tip can only justify reasonable suspicion for a *Terry* stop, if it creates a reasonable suspicion that "criminal activity may be afoot." For example, in *Brown*, the police received an anonymous telephone tip that "a short, black male with glasses was carrying a firearm outside the Roseman Court apartment complex." *United States v. Brown*, 401 F.3d 588, 590 (4th Cir. 2005) (internal citations omitted). The Court found that:

> [a]n anonymous telephone tip that alleges illegal possession of a firearm but that merely identifies a suspect and his location does not itself provide reasonable suspicion for a *Terry* stop. To justify a *Terry* stop, such a tip must contain sufficient 'indicia of reliability' to enable officers to evaluate the veracity of the tip before stopping whomever the tip identifies. For example, an anonymous telephone tip sufficient to justify a *Terry* stop might predict a suspect's future actions, which can then be corroborated by police surveillance of the suspect's movement. Once the predictions are corroborated, police may have reasonable suspicion to make a *Terry* stop.

*Id.* at 596. The Court further explained that "[w]hile the officers were able to corroborate immediately the identification and location components of the tip, at no point before Officer Lewis ordered Brown against the car did the officers observe any conduct by Brown that would cause them to suspect that he was carrying a firearm." *Id.* The Fourth Circuit held that "the anonymous tip alone did not provide reasonable suspicion to justifying seizing Brown… [b]ecause the officers had acquired no additional information that Brown was carrying a firearm." *Id.*

Similarly, in *J.L.*, the Supreme Court found that the anonymous tip that "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun" was not sufficient to justify the police officer's stop and frisk of that person. *J.L.*, 529 U.S. at 270. Police arrived just six minutes after the call and saw three black males "hanging out" at the stop, one of whom was wearing a plaid shirt. *Id.* The officers did not see a firearm and J.L. did not make any "threatening" or "unusual movements." *Id.* The officers approached J.L., frisked him and seized a firearm from his pocket. *Id.* The Court held that the anonymous telephone tip did not provide reasonable suspicion to justify the stop and frisk. *Id.* at 272. The Court reasoned that "[t]he

reasonable suspicion here at issue requires that a tip be *reliable in its assertion of illegality*, not just in its tendency to identify a determinate person." *Id*. (emphasis added).

The Court in *Navarette* similarly stated that "[e]ven a reliable tip will justify an investigative stop *only if* it creates reasonable suspicion that 'criminal activity may be afoot.'" *Id*. at 1690 (emphasis added). The Court pointed to the specificity and the content of the 911 caller's information as providing "a significant indicator of drunk driving." *Id.* at 1691 (explaining that "the 911 caller in this case reported more than a minor traffic infraction and more than a conclusory allegation of drunk or reckless driving. Instead, she alleged a specific and dangerous result of the driver's conduct."). In sum, the anonymous tip must allege some facts demonstrating an individual is engaged in criminal activity in order to justify a *Terry* stop. *See United States v. Cortez*, 449 U.S. 411, 417 (1981) (stating that "[a]n investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity.").

The Court notes that the above cited cases involve the veracity of a tip to support reasonable suspicion of criminal activity to justify a *Terry* stop. Based on the case law cited above, it is apparent that the tip in the present case, alone, is insufficient to support reasonable suspicion of criminal activity to allow for an investigative stop of Defendant's vehicle because the activity reported, carrying and concealing a firearm, is not a crime in West Virginia. However, at issue in the present case is whether the anonymous tip supported a reasonable suspicion that Defendant was armed and dangerous to justify the *Terry* frisk for weapons. Similar to the *Terry* stop analyses above, the anonymous tip must not only be reliable, but must also contain some facts demonstrating an "objective manifestation" that the person to be frisked is armed and dangerous.

The anonymous caller reported that he observed a black male loading and concealing a firearm. However, West Virginia is an open carry state and residents may conceal a loaded firearm with the issuance of a license. *See* W. Va. Code § 61-7-4. Therefore, merely possessing a concealed weapon does not necessarily indicate criminal activity or dangerousness. The Fourth Circuit clearly stated that "[b]eing a felon in possession of a firearm is not the default status." *United States v. Black*, 707 F.3d 531, 540 (4th Cir. 2013). In *Black,* the Government argued that "it would be 'foolhardy' for the officers to 'go about their business while allowing a stranger in their midst to possess a firearm," to which the Fourth Circuit responded, "[w]e are not persuaded." *Id.* The Court reasoned that "where a state permits individuals to openly carry firearms, the exercise of this right, without more, cannot justify an investigatory detention. Permitting such a justification would eviscerate Fourth Amendment protections for lawfully armed individuals in those states." [6] *Id.* (citing *United States v. King*, 990 F.2d 1552, 1559 (10th Cir. 1993)).

In this case, the content of the tip provided to the police, while reporting the individual was armed, does not contain any information demonstrating that the individual was engaging in any "objective or particularized" dangerous behavior. Officer Tharp testified that the information reported by the anonymous caller – that a person as in possession of and concealed a loaded firearm – was, in fact, not reporting a crime or any criminal activity. (Tr. 26-27). The anonymous tip provided no information indicating that the person observed in the parking lot was engaging in an illegal activity, making threats, brandishing the weapon or conducting himself in any

---

[6] The Court recognizes that the *Black* case only involves whether possession of a firearm in an open-carry state is sufficient to support reasonable suspicion that a person is engaging in criminal activity. The undersigned is persuaded that the Court's reasoning – that merely exercising one's right to bear arms should not be grounds for police invasion of privacy – would similarly apply to the frisk of a person's body, not only the investigative detention.

manner that others would perceive as dangerous.[7] Similarly, the anonymous tip did not include information regarding the caller's familiarity with the man possessing the firearm indicating knowledge that he did not have a concealed carry permit or was not permitted to possess a firearm.

Moreover, Officer Hudson and Captain Roberts did not testify to any facts they observed after making the traffic stop that would corroborate the information provided by the anonymous caller that Defendant was in fact armed. Similarly, the officers testified to no objective and particularized facts demonstrating that Defendant was dangerous at the time of the traffic stop. The Government presented no evidence indicating the officers' perceived any movements or received any statements demonstrating Defendant was nervous, uncooperative or dangerous. While Captain Roberts testified that Defendant gave a "weird look" indicating that "I don't want to lie to you, but I'm not going to tell you anything," this "look" even in combination with the tip still does not give rise to reasonable suspicion of dangerousness. While the "weird look" may indicate Defendant's unwillingness to cooperate at this stage of the stop, exercising his Fifth Amendment right to remain silent does not transform his silence into dangerousness. Moreover, the officer's subjective impression, without more, is insufficient to justify the search of Defendant's person.

The undersigned is sympathetic to the inherent dangers that police face when they approach vehicles with occupants they have reason to believe are armed. However, the Supreme Court recognized the inherent danger of firearms and the risk posed by armed criminals but

---

[7] Captain Roberts testified that he conducted the frisk "because he was supposedly exposing a gun or brandishing a gun at the 7-Eleven store. If he is carrying a weapon, he has to have a permit if it is in a vehicle or concealed." (Tr. 65). However, the evidence presented to the Court regarding the anonymous tip is only that Defendant loaded and then concealed the firearm, not that he exposed or brandished the firearm. In addition, the caller never stated that the man observed loading and concealing the firearm was known to him as a felon or person who did not have a permit to conceal a weapon.

explained that the lower standard of "reasonable suspicion" rather than "probable cause" to search for weapons accounted for this greater risk:

> Firearms are dangerous, and extraordinary dangers sometimes justify unusual precautions. Our decisions recognize the serious threat that armed criminals pose to public safety; *Terry 's* rule, which permits protective police searches on the basis of reasonable suspicion rather than demanding that officers meet the higher standard of probable cause, responds to this very concern.

*J.L.,* 529 U.S. at 272 (citing *Terry,* 392 U.S., at 30). In this case, the Court flatly rejected the request to create a "firearm exception" that would allow police to conduct investigatory stops and frisks on the basis of a bare-boned anonymous tip. *Id.* The Court explained that "[s]uch an exception would enable any person seeking to harass another to set in motion an intrusive, embarrassing police search of the targeted person simply by placing an anonymous call falsely reporting the target's unlawful carriage of a gun. Nor could one securely confine such an exception to allegations involving firearms." *Id.*

While the officers testified regarding their concern for officer safety, the standard is not whether a generalized concern for officer safety existed but rather whether "objective and particularized" articulable facts raised a suspicion that Defendant was dangerous. *See Sakyi*, 160 F.3d at 168-69. The undersigned finds that the Government is unable to articulate any specific fact, other than Defendant's possession of a firearm in a high crime neighborhood, a legal activity in the state of West Virginia, which would justify the officer's suspicion that Defendant was dangerous. Accordingly, the totality of the circumstances in this case fail to demonstrate the officers possessed a "particularized and objective basis" to suspect that Defendant was armed and dangerous.

## VI.   CONCLUSION

The only factors in support of the protective search are the anonymous tip that Defendant was armed, he happened to be in a high crime area and he gave a "weird look." The Government

24

presented no objective and particularized articulable facts demonstrating a suspicion that Defendant was dangerous, beyond his location in or proximity to a high crime area or the subjective impressions of an officer. Under the Government's argument, every person legally carrying a gun would be at risk for an invasion of their privacy because the suspicion that they are armed would follow in every circumstance the suspicion that they are also dangerous. West Virginia's open carry law, which includes the right to conceal a firearm with a permit, is not suspended simply because an individual is residing or located in a high crime area. Officers could have questioned Defendant regarding the tip, his activities that day, asked for his name and ran a background check, or simply asked for consent to search. Instead, officers conducted a *Terry* frisk based solely on the anonymous tip that Defendant was in possession of a firearm, a legal activity in West Virginia, without any articulable facts demonstrating Defendant was presently dangerous.

## VII.   RECOMMENDATION

For the reasons stated herein, it is **RECOMMENDED** that Defendant's Motion to Suppress (ECF No. 21) be **GRANTED** and any and all evidence seized as a result of the illegal *Terry* frisk be **SUPPRESSED**.

Any party may, by Tuesday, August 12, 2014 at 5:00 p.m. EST, file with the Clerk of the Court any written objections to this Report and Recommendation.  The party should clearly identify the portions of the Report and Recommendation to which the party is filing an objection and the basis for such objection. The party shall also submit a copy of any objections to the Honorable Gina M. Groh, United States District Judge. Failure to timely file objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon this Report and Recommendation. 28 U.S.C. § 636(b)(1).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

**DATED**: August 8, 2014

ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE